**SIRI SHETTY**
California State Bar No. 208812
110 West "C" Street #1810
San Diego, California  92101-5008
Telephone:  (619) 602-8479
E-mail: attyshetty@yahoo.com

Attorneys for Mr. Vega-Sendejas

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE MARILYN L. HUFF)**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 08CR0889-H |
| ) | |
| Plaintiff, ) | Date:   May 12, 2008 |
| ) | Time:   2:00 p..m. |
| v. ) | |
| ) | |
| RAMIRO VEGA-SENDEJAS, ) | **STATEMENT OF FACTS AND POINTS AND** |
| ) | **AUTHORITIES IN SUPPORT OF MOTIONS** |
| ) | |
| Defendant. ) | |

**I.**

**STATEMENT OF FACTS**[1]

On March 3, 2008, Mr. Vega-Sendejas was arrested  near the border. Agents allege that he has no legal right to be in the United States, that he was previously removed to Mexico on February 14, 2008, and that there are not records indicating that he subsequently reapplied to legally enter the United States.

On March 26, 2008, Mr. Vega-Sendejas was indicted by a federal grand jury, which charged him with a violation of 8 U.S.C. §§ 1326.  He entered a plea of not guilty. These motions follow.

---

[1]  The following statement of facts is based on the probable cause statement and limited discovery provided by the government. Mr. Vega-Sendejas in no way admits the truth of these facts nor their accuracy as cited in these motions. Further, he reserves the right to take a position contrary to the following statement of facts at the motions hearing and at trial.

**II.**

**MOTION TO COMPEL DISCOVERY**

This request for discovery is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies" under United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989):

(1) Mr. Vega-Sendejas's Statements. The government must disclose: (a) copies of any written or recorded statements made by Mr. Vega-Sendejas; (b) copies of any written record containing the substance of any statements made by Mr. Vega-Sendejas; and (c) the substance of any statements made by Mr. Vega-Sendejas that the government intends to use, for any purpose, at trial. See Fed. R. Crim. P. 16(a)(1)(A)-(B). This request specifically includes a copy of any **audio and video-taped statements** of Mr. Vega-Sendejas and any rough notes agents took of his statements.

(2) Mr. Vega-Sendejas's Prior Record. Mr. Vega-Sendejas requests disclosure of his prior record. This includes Mr. Fudge's record of contacts with the United States Border Patrol and/or the Immigration and Naturalization Service, even if those contacts did not result in prosecution. See Fed. R. Crim. P. 16(a)(1)(D).

(3) Arrest Reports, Notes and Dispatch Tapes. Mr. Vega-Sendejas also specifically requests the government to turn over all arrest reports, notes, dispatch or any other tapes that relate to he circumstances surrounding his arrest or any questioning. This request includes, but it is not limited to, any rough notes, photographs, records, reports, transcripts or other discoverable material. Fed. R. Crim. P. 16 (a)(1)(A)-(B), (E); Brady v. Maryland, 373 U.S. 83 (1983). The government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the defendant. Fed. R. Crim. P. 16 (a)(1)(A)-(B), (E); Fed. R. Crim. P. 26.2.

(4) Documents and Tangible Objects. Mr. Vega-Sendejas requests the opportunity to inspect, copy, and photograph all documents and tangible objects which are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to him. See Fed. R. Crim. P. 16(a)(1)(E).

1    (5) <u>Reports of Scientific Tests or Examinations</u>.  Mr. Vega-Sendejas requests the reports of all

2   tests and examinations which are material to the preparation of the defense or are intended for use by

3   the government at trial.  <u>See</u> Fed. R. Crim. P. 16(a)(1)(F).

4    (6) <u>Expert Witnesses</u>.  Mr. Vega-Sendejas requests the name and qualifications of any person

5   that the government intends to call as an expert witness.  <u>See</u> Fed. R. Crim. P. 16(a)(1)(G).  In addition,

6   Mr. Vega-Sendejas requests written summaries describing the bases and reasons for the expert's

7   opinions.  <u>See</u> <u>id.</u>  We request that the Court order the government to notify the defense as such in a

8   timely manner, so that a proper 104 (<u>Kumho</u>-<u>Daubert</u>) admissibility hearing can be conducted without

9   unduly delaying the trial.

10    (7) <u>Brady Material</u>.  Mr. Vega-Sendejas requests all documents, statements, agents' reports, and

11   tangible evidence favorable to the defendant on the issue of guilt or punishment.  <u>See</u> <u>Brady v.</u>

12   <u>Maryland</u>, 373 U.S. 83 (1963).  This request specifically includes a copy of any **audio and video-taped**

13   **statement** of material witnesses and any rough notes agents took of their statements.

14    In addition, impeachment evidence falls within the definition of evidence favorable to the

15   accused, and therefore Mr. Vega-Sendejas requests disclosure of any impeachment evidence

16   concerning any of the government's potential witnesses, including prior convictions and other evidence

17   of criminal conduct.  <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427

18   U.S. 97 (1976); <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991).  This request includes, but is

19   not limited to, any complaints filed (by a member of the public, by another agent, or any other person)

20   against the agent, whether or not the investigating authority has taken any action, as well as any matter

21   for which a disciplinary review was undertaken, whether or not any disciplinary action was ultimately

22   recommended.  In addition, Mr. Vega-Sendejas requests any evidence tending to show that a

23   prospective government witness: (a) is biased or prejudiced against the defendant; (b) has a motive to

24   falsify or distort his or her testimony; (c) is unable to perceive, remember, communicate, or tell the

25   truth; or (d) has used narcotics or other controlled substances, or has been an alcoholic.

26    (8) <u>Request for Preservation of Evidence</u>.  Mr. Vega-Sendejas specifically requests the

27   preservation of all physical or documentary evidence that may be destroyed, lost, or otherwise put out

28

1  of the possession, custody, or care of the government and that relate to the arrest or the events leading

2  to the arrest in this case.

3      (9)  <u>Any Proposed 404(b) Evidence</u>.  "[U]pon request of the accused, the prosecution . . . shall

4  provide reasonable notice in advance of trial . . . of the general nature" of any evidence the government

5  proposes to introduce under Rule 404(b).  Fed. R. Evid. 404(b).  Mr. Vega-Sendejas requests such

6  notice three weeks before trial in order to allow for adequate trial preparation.

7      This includes any "TECS" records (records of prior border crossings) that the Government

8  intends to introduce at trial, whether in its case-in-chief, impeachment, or rebuttal.  Although there is

9  nothing intrinsically improper about prior border crossings, they are nonetheless subject to 404(b), as

10  they are "other acts" evidence that the government must produce before trial.  <u>See</u> <u>United States v.</u>

11  <u>Vega</u>, 188 F.3d 1150, 1154-1155 (9th Cir. 1999).

12      (10)  <u>Jencks Act Material</u>.  Mr. Vega-Sendejas requests production in advance of trial of all

13  material discoverable pursuant to the Jencks Act, 18 U.S.C. § 3500.  Advance production will avoid

14  needless delays at pretrial hearings and at trial.  This request includes any "rough" notes taken by the

15  agents in this case; these notes must be produced pursuant to 18 U.S.C. § 3500(e)(1).  This request also

16  includes production of transcripts of the testimony of any witness before the grand jury.  <u>See</u> 18 U.S.C.

17  § 3500(e)(3).

18      (11)  <u>Residual Request</u>.  Mr. Vega-Sendejas intends by this discovery motion to invoke his rights

19  to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the

20  Constitution and laws of the United States.

21

22                                             **III.**

23  **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'**
    **INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN**
24  **AFOUL OF BOTH _NAVARRO-VARGAS_ AND _WILLIAMS_ AND VIOLATE THE FIFTH**
    **AMENDMENT BY DEPRIVING MR. VEGA-SENDEJAS OF THE TRADITIONAL**
25                        **FUNCTIONING OF THE GRAND JURY**

26  **A.    Introduction.**

27      The indictment in the instant case was returned by the January 2007 grand jury.  <u>See</u> Clerk's Record

28  at 6.  That grand jury was instructed by Judge Burns on January 11, 2007.  <u>See</u> Reporter's Partial Transcript

                                             4

of the Proceedings, dated January 11, 2007 (Exhibit A hereto).  Judge Burns' instructions to the impaneled

grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand

jury instruction previously given in this district in several ways.[2]  These instructions compounded Judge

Burns' erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury

panel, which immediately preceded the instructions at Ex. A.  <u>See</u> Reporter's Transcript of Proceedings,

dated January 11, 2007 (Exhibit B hereto).

> **1.     Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

responsibility, <u>see</u> Exh. A at 3, 3-4, 5,[3] Judge Burns instructed the grand jurors that they were forbidden

"from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should

be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you."

<u>See id.</u> at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree

with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though

the evidence may be insufficient.'"  <u>See id.</u> at 8-9.  Thus, the instruction flatly bars the grand jury from

declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

to an instance in the grand juror selection process in which it excused three potential jurors.  <u>See id.</u> at 8.

> I've gone over this with a couple of people.  You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

---

[2] <u>See e.g.</u>, <u>United States v. Cortez-Rivera</u>, 454 F.3d 1038 (9th Cir. 2006); <u>United States v. Navarro-Vargas</u>, 408 F.3d 1184 (9th Cir.) (<u>en banc</u>), cert. denied, 126 S. Ct. 736 (2005) (<u>Navarro-Vargas II</u>); <u>United States v. Navarro-Vargas</u>, 367 F.3d 896 (9th Cir. 2004)(<u>Navarro-Vargas I</u>); <u>United States v. Marcucci</u>, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[3] <u>See also id.</u> at 20 ("You're all about probable cause.").

1   Id.  That "principle" was Judge Burns' discussion of the grand jurors' inability to give effect to their

2   disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on its

3   view of their discretion; it enforced that view on pain of being excused from service as a grand juror.

4        Examination of the recently disclosed voir dire transcript, which contains additional instructions and

5   commentary in the form of the give and take between Judge Burns and various prospective grand jurors,

6   reveals how Judge Burns' emphasis of the singular duty is to determine whether or not probable cause exists

7   and its statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress

8   merely compounded an erroneous series of instructions already given to the grand jury venire.  In one of

9   its earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable

10  cause determination.

11       [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
         crime was committed?  And second, do we have a reasonable belief that the person that they
12       propose that we indict committed the crime?"

13       If the answer is "yes" to both of those, then the case should move forward.  If the answer to
         either of the questions is "no," then the grand jury should not hesitate and not indict.
14

15  See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

16  term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

17  addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

18  committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

19  crime."

20       Equally revealing are Judge Burns' interactions with two potential grand jurors who indicated that,

21  in some unknown set of circumstances, they might decline to indict even where there was probable cause.

22  Because of the redactions of the grand jurors' names, Mr. Vega-Sendejas will refer to them by occupation.

23  One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter

24  REA).  The CSW indicated a view that no drugs should be considered illegal and that some drug

25  prosecutions were not an effective use of resources.  See id. at 16.  The CSW was also troubled by certain

26  unspecified immigration cases.  See id.

27       Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

28  CSW.  It never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in

1   this district, such as drug smuggling cases and cases involving reentry after deportation and alien

2   smuggling.  Rather, it provided instructions suggesting that, in any event, any scruples CSW may have

3   possessed were simply not capable of expression in the context of grand jury service.

4           Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as the
        defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair
5       appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled
        to a fair judgment.  If there's probable cause, then the case should go forward.  *I wouldn't*
6       *want you to say*, "well, yeah, there's probable cause, but I still don't like what our government
        is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that is
7       your frame of mind, the probably you shouldn't serve.  Only you can tell me that.

8   See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let the grand

9   juror know that it would not want him or her to decline to indict in an individual case where the grand juror

10  "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See Id.

11  Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made

12  manifest by Judge Burns' use of the pronoun "I", the CSW indicated that it "would be difficult to support

13  a charge even if [the CSW] thought the evidence warranted it."  See id.  Again, Judge Burns' question

14  provided no context; Judge Burns inquired regarding "a case," a term presumably just as applicable to

15  possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for

16  distribution.  Any grand juror listening to this exchange could only conclude that there was *no* case in

17  which Judge Burns would permit them to vote "no bill" in the face of a showing probable cause.

18          Just in case there may have been a grand juror that did not understand his or her inability to exercise

19  anything like prosecutorial discretion, Judge Burns drove the point home in its exchange with REA.  REA

20  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

21  "medical marijuana."  See id. at 24.  Judge Burns first sought to address REA's concerns about medical

22  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

23  considerations into account.

24          Well, those things -- the consequences of your determination shouldn't concern you in the
        sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they
25      cannot consider the punishment or the consequence that Congress has set for these things.
        We'd ask you to also abide by that.  We want you to make a business-like decision of whether
26      there was a probable cause. . . .

27  Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns

28  went on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

7

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." <u>See</u> <u>id.</u> That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."
>
> You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

<u>Id.</u> at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

> The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
> REA: It would depend on the case.
> The Court: Is there a chance that you would do that?
> REA: Yes.
> The Court: I appreciate your answers. I'll excuse you at this time.

<u>Id.</u> at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," <u>see</u> <u>id.</u>, as it should. Because REA's vote "depend[s] on the case," <u>see</u> <u>id.</u>, it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge Burns made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going

forward."[4]  See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

### 2. The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.

In addition to its instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex. A at 20.[5]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're all about probable cause.  If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are*

---

[4]  This point is underscored by Judge Burns' explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances" before it has been presented with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

[5]  These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir dire go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns' discussion of once having been a prosecutor before the Grand Jury compounded the error inherent of praising the government attorneys.  See Ex. A at 9-10.  Judge Burns' instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, it would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns' instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked."  See Ex. A at 12.  As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors."  Navarro-Vargas, 408 F.3d at 1215.  The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court.  See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

1     *duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

2

3   Id. (emphasis added).

4         The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that

5 "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns

6 gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's

7 something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that."

8 See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any

9 evidence that was "adverse" or "that cuts against the charge." See id.

10 **B.**   ***Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in Its Instructions as a Whole During Impanelment.**

11

12         The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

13 grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth

14 Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly

15 formalistic approach[6] to the problems posed by the instructions, endorsed many of the substantive

16 arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled

17 with the role of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and

18 instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking

19 a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause

20 determinations and utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution

21 the Framers envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992).

22         For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

23 II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

24 deciding whether a particular prosecution shall be instituted or followed up, performs much the same

25 function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478,

26

27      [6] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because

28 "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

510 (1978)). <u>Accord</u> <u>United States v. Navarro-Vargas</u>, 367 F.3d 896, 900 (9th Cir. 2004) (<u>Navarro-Vargas</u>

<u>I</u>)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

prosecutorial." ).  <u>See also</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes

that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury,

<u>id.</u>, but also that "the grand jury has no obligation to prepare a presentment or to return an indictment

drafted by the prosecutor."    <u>Id.</u>  <u>See</u> Niki Kuckes, <u>The Democratic Prosecutor:  Explaining the</u>

<u>Constitutional Function of the Federal Grand Jury</u>, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's

discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the

perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting

Wayne LaFave et al., <u>Criminal Procedure</u> § 15.2(g) (2d ed. 1999)).

Indeed, the <u>Navarro-Vargas II</u> majority agrees that the grand jury possesses all the attributes set forth

in <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986).  <u>See</u> <u>id.</u>

> The grand jury thus determines not only whether probable cause exists, but also whether to
> "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps
> most significant of all, a capital offense or a non-capital offense -- all on the basis of the same
> facts.  And, significantly, the grand jury may refuse to return an indictment even "'where a
> conviction can be obtained.'"

<u>Id.</u> (quoting <u>Vasquez</u>, 474 U.S. at 263).  The Supreme Court has itself reaffirmed <u>Vasquez</u>'s description of

the grand jury's attributes in <u>Campbell v. Louisiana</u>, 523 U.S. 392 (1998), noting that the grand jury

"controls not only the initial decision to indict, but also significant questions such as how many counts to

charge and whether to charge a greater or lesser offense, including the important decision whether to charge

a capital crime."  <u>Id.</u> at 399 (citing <u>Vasquez</u>, 474 U.S. at 263).  Judge Hawkins notes that the <u>Navarro-</u>

<u>Vargas II</u> majority accepts the major premise of <u>Vasquez</u>: "the majority agrees that a grand jury has the

power to refuse to indict someone even when the prosecutor has established probable cause that this

individual has committed a crime."  <u>See</u> <u>id.</u> at 1214 (Hawkins, J. dissenting).  <u>Accord</u> <u>Navarro-Vargas I</u>,

367 F.3d at 899 (Kozinski, J., dissenting); <u>United States v. Marcucci</u>, 299 F.3d 1156, 1166-73 (9th Cir.

2002) (per curiam) (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys

strong support in the Ninth Circuit.

**C.    Judge Burns' Instructions Forbid the Exercise of Grand Jury Discretion Established in Both <u>Vasquez</u> and <u>Navarro-Vargas II</u>.**

11

1    The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

2    jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

3    decision in Marcucci. Marcucci reasoned that the instructions do not mandate that grand jurors indict upon

4    every finding of probable cause because the term "should" may mean "what is probable or expected." 299

5    F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge

6    Hawkins ably pointed out. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

7    instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

8    obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). See

9    also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American

10   Diction and Language Guide 1579 (1999) (brackets in original)).

11   The debate about what the word "should" means is irrelevant here; the instructions here make no

12   such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not

13   choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

14   disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote

15   against indicting even though I think that the evidence is sufficient'...." See Ex. A at 8-9. Thus, the

16   instruction flatly bars the grand jury from declining to indict because they disagree with a proposed

17   prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess

18   "the need to indict." Vasquez, 474 U.S. at 264.

19   While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

20   an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is clear that it could

21   only mean "should" in the obligatory sense. For example, when addressing a prospective juror, Judge

22   Burns not only told the jurors that they "should" indict if there is probable cause, it told them that if there

23   is not probable cause, "then the grand jury should hesitate and not indict." See id. at 8. At least in context,

24   it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room

25   for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205.

26   Clearly it was not.

27   The full passage cited above effectively eliminates any possibility that Judge Burns intended the

28   Navarro-Vargas spin on the word "should."

12

1

2

[T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"

3

4

If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

5    See Ex. B at 8. Of the two sentences containing the word "should," the latter of the two essentially states

6    that if there is no probable cause, you *should* not indict. Judge Burns could not possibly have intended to

7    "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408

8    F.3d at 1205 (citing Marcucci, 299 F.3d at 1159). That would contravene the grand jury's historic role of

9    protecting the innocent. See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

10   "responsibilities continue to include both the determination whether there is probable cause and the

11   protection of citizens against unfounded criminal prosecutions.") (citation omitted).

12       By the same token, if Judge Burns said that "the case should move forward" if there is probable

13   cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

14   Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then it would have to have intended

15   two different meanings of the word "should" in the space of two consecutive sentences. That could not

16   have been its intent. But even if it were, no grand jury could ever have had that understanding.[7] Jurors are

17   not presumed to be capable of sorting through internally contradictory instructions. See generally United

18   States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court

19   cannot presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

20       Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

21   clear to the grand jurors that "should" was not merely suggestive, but obligatory:

22       **(1)**    The first occasion occurred in the following exchange when Judge Burns conducted voir dire

23   and excused a potential juror (CSW):

24

25

The Court: . . . If there's probable cause, then the case should go forward. I wouldn't want you to say, "Well, yeah, there's probable cause. But I still don't like what the government is

26

27

28

[7] This argument does not turn on Mr. Vega-Sendejas' view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible. Rather, it turns on the context in which the word is employed by Judge Burns in its unique instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

1    doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that's your
     frame of mind, then probably you shouldn't serve. Only you can tell me that.
2    Prospective Juror: Well, I think I may fall in that category.
     The Court: In the latter category?
3    Prospective Juror: Yes.
     The Court: Where it would be difficult for you to support a charge even if you thought the
4    evidence warranted it?
     Prospective Juror: Yes.
5    The Court: I'm going to excuse you then.

6    See Ex. B at 17. There was nothing ambiguous about the word "should" in this exchange with a

7    prospective juror. Even if the prospective juror did not like what the government was doing in a particular

8    case, that case "should go forward" and Judge Burns expressly disapproved of any vote that might prevent

9    that. See id. ("I wouldn't want you [to vote against such a case]"). The sanction for the possibility of

10   independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and

11   secondary deterrence as to the exercise of discretion by any other prospective grand juror.

12        **(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear that it

13   there is an unbending obligation to indict if there is probable cause. Grand jurors have no other

14   prerogative.

15        The Court: . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

16        You'd have a similar *obligation* as a grand juror even though you might have to grit your
          teeth on some cases. Philosophically, if you were a member of Congress, you'd vote against,
17        for example, criminalizing marijuana. I don't know if that's it, but you'd vote against
          criminalizing some drugs.
18
          That's not what your *prerogative* is here. Your prerogative instead is act like a judge and to
19        say, "All right. This is what I've got to deal with objectively. Does it seem to me that a crime
          was committed? Yes. Does it seem to me that this person's involved? It does." *And then*
20        *your obligation, if you find those things to be true, would be to vote in favor of the case going*
          *forward*.
21

22   Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and

23   prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even

24   though you were convinced there was probable cause they committed a drug offense?" Id. at 27. The

25   potential juror responded: "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at

26   28. Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is

27   obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

28

                                                    14

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case." Thus, it is clear that Judge Burns' point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because its message is that there is no discretion not to indict.

**(3)** As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws here." See id. at 61.

**(4)** And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when it reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court: In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court: Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.* We want you to make a business-like decision of whether there was a probable cause. ...

See Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.

15

1    See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006). Cortez-Rivera is inapposite

2    for two reasons. First, Judge Burns did not use the term "should" in the passage quoted above. Second,

3    that context, as well as its consistent use of a mandatory meaning in employing the term, eliminate the

4    ambiguity (if there ever was any) relied upon by Cortez-Rivera. The instructions again violate Vasquez,

5    which plainly authorized consideration of penalty information. See 474 U.S. at 263.

6        Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

7    again that they had a duty, an obligation, and a singular prerogative to indict each and every case where

8    there was probable cause. These instructions go far beyond the holding of Navarro-Vargas and stand in

9    direct contradiction of the Supreme Court's decision in Vasquez. Indeed, it defies credulity to suggest that

10    a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court

11    held in Vasquez:

12        The grand jury does not determine only that probable cause exists to believe that a defendant
       committed a crime, or that it does not. In the hands of the grand jury lies the power to charge

13        a greater offense or a lesser offense; numerous counts or a single count; and perhaps most
       significant of all, a capital offense or a non-capital offense – all on the basis of the same facts.

14        Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be
       obtained."

15

16    474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

17    dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only

18    the initial decision to indict, but also significant decisions such as how many counts to charge and whether

19    to charge a greater or lesser offense, including the important decision whether to charge a capital crime.").

20    Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to

21    indict." See id. at 264. Judge Burns' grand jury is not Vasquez's grand jury. The instructions therefore

22    represent structural constitutional error "that interferes with the grand jury's independence and the integrity

23    of the grand jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). The

24    indictment must therefore be dismissed. Id.

25        The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the

26    instructions excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

27    independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

28    decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may

1  have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

2  independent." Id. at 1202 (emphases in the original).

3  Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

4  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

5  of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting).  The

6  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

7  making a probable cause determination ... unconstitutionally undermines the very structural protections that

8  the majority believes save[] the instruction." Id.  After all, it is an "'almost invariable assumption of the

9  law that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).

10  If that "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role

11  described in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give

12  jurors erroneous instructions because nothing will happen if they disobey them." Id.

13  In setting forth Judge Hawkins' views, Mr. Vega-Sendejas understands that this Court may not adopt

14  them solely because the reasoning that supports them is so much more persuasive than the majority's

15  sophistry.  Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

16  Here, again, the question is not an obscure interpretation of the word "should", especially in light

17  of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by

18  the Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban

19  on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez,

20  Campbell, and both Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but

21  not only that.

22  Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states

23  they enjoy.  It also excused prospective grand jurors who might have exercised that Fifth Amendment

24  prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See

25  Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot

26  embolden grand jurors who are no longer there, likely because they expressed their willingness to act as

27  the conscience of the community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting)

28  (a grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches

1   of government by acting as the 'conscience of the community.'") (quoting <u>Gaither v. United States</u>, 413 F.2d

2   1061, 1066 & n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

3   their own initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and,

4   here, Judge Burns has both fashioned its own rules and enforced them.

5   **D.    The Instructions Conflict with *Williams'* Holding That There Is No Duty to Present**
    **Exculpatory Evidence to the Grand Jury.**

6

7           In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

8   argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

9   exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

10  common law.  <u>See</u> 504 U.S. at 45, 51.  <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

11  judicial authority exists." <u>See id.</u> at 47.  Indeed, although the supervisory power may provide the authority

12  "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

13  amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

14  Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted),

15  it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."

16  <u>Id.</u> at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

17  initiative, rules of grand jury procedure." <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the defendant's

18  claim, both as an exercise of supervisory power and as Fifth Amendment common law.  <u>See id.</u> at 51-55.

19          Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

20  present to them evidence that tended to undercut probable cause.  <u>See</u> Ex. A at 20.

21          Now, again, this emphasizes the difference between the function of the grand jury and the
            trial jury.  You're all about probable cause.  If you think that there's evidence out there that
22          might cause you say "well, I don't think probable cause exists," then it's incumbent upon you
            to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-*
23          *bound to present evidence that cuts against what they may be asking you to do if they're*
            *aware of that evidence.*
24

25  <u>Id.</u> (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

26  duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

27  [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See</u>

28

1    id. at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See

2    Navarro-Vargas, 408 F.3d at 1207.

3           This particular instruction has a devastating effect on the grand jury's protective powers, particularly

4    if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not

5    conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once

6    again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that

7    was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they

8    likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors

9    that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the

10   prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes

11   against probable cause, but, if none is presented by the government, they can presume that there is none.

12   After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what

13   they may be asking you to do if they're aware of that evidence." See id. Moreover, during voir dire, Judge

14   Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's

15   something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do that*."

16   See Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have

17   been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S.

18   Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith

19   in all matters presented to you." See Ex. A at 27.

20          These instructions create a presumption that, in cases where the prosecutor does not present

21   exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no

22   exculpatory evidence was presented, would proceed along these lines:

23       (1)    I have to consider evidence that undercuts probable cause.
         (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such
24              evidence to me, if it existed.
         (3)    Because no such evidence was presented to me, I may conclude that there is none.
25

26   Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

27   evidence presented represents the universe of all available exculpatory evidence; if there was more, the

28   duty-bound prosecutor would have presented it.

1    The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

2    prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

3    probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

4    of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

5    the Fifth Amendment.

## IV.

## CONCLUSION

For these and all the foregoing reasons, the defendant, Mr. Vega-Sendejas, respectfully requests

that this Court grant his motions and grant any and all other relief deemed proper and fair.

Respectfully submitted,

Dated: April 28, 2008

*/s/ Siri Shetty*
**SIRI SHETTY**
Attorney for Mr. Vega-Sendejas
Email: attyshetty@yahoo.com

20